**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| MATTHEW LATURNER, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MNTN, INC., MARK DOUGLAS, and PATRICK A. POHLEN,<br><br>Defendants. | **Case No:** 1:26-CV-3242<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Matthew LaTurner ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding MNTN, Inc. ("MNTN" or the "Company", and which is pronounced "Mountain"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded MNTN securities between August 5, 2026 and November 4, 2026, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by

Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act"). [1]

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased MNTN securities during the Class Period and was economically damaged thereby.

7. Defendant MNTN purports to be a "technology platform that brings performance marketing to Connected TV."

[1] Unless otherwise stated, all emphasis is added and internal citations are omitted.

8. Defendant MNTN incorporated in Delaware and its head office is located at 823 Congress Avenue # 1827, Austin, Texas, 78768. MNTN securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "MNTN."

9. Defendant Mark Douglas ("Douglas") served as the Company's Chief Executive Officer ("CEO"), as well as Chairman of the Board at the beginning of the Class Period. He was terminated by the Board of Directors (the "Board") from the CEO and role on November 1, 2026 as a result of the misconduct detailed in this complaint.

10. Defendant Patrick A. Pohlen ("Pohlen") served as the Company's Chief Financial Officer at all relevant times.

11. Defendants Douglas and Pohlen are collectively referred to herein as the "Individual Defendants."

12. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

13. MNTN is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to MNTN under *respondeat superior* and agency principles.

15. Defendant MNTN and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Class Period

16. On August 4, 2026, after market hours, the Company issued a press release entitled "MNTN Reports Second Quarter 2026 Results". The press release gave the following Q3 2026 outlook:

- Revenue is expected to be ***between $86 million and $89 million***, representing expected year-over-year growth of 25% at the midpoint.
- Adjusted EBITDA is expected to ***be between $22 million and $25 million***.

17. The press release gave the following information regarding the Company's Full Year 2026 Outlook:

- ***Revenue is expected to be between $347 million and $357 million***, representing expected year-over-year growth of 24% at the midpoint excluding the impact of the Maximum Effort divestiture, and 21% year-over-year growth on a GAAP basis.
- Adjusted EBITDA is expected to be between ***$96 million and $101 million***.

18. The statements in ¶¶ 16-17 were materially false and misleading at the time they were made because the highlighted financial metrics were not likely to be achieved, because Defendants instituted changes in the compensation structure for the Company's sales team during the Second Quarter of 2026 (i.e., before the statements were made) which caused many members of the Company's sales team to leave. As a result, the Company's ability to generate new business was materially harmed at the time the statement was made.

19. On August 4, 2026, after market hours, the Company held its earnings call for the second quarter of 2026 (the "Q2 Call"). Defendant Douglas made the following statement on the Q2 Call:

> Thank you for joining us today. MNTN delivered a strong second quarter with revenue of $82.5 million, representing 21% year-over-year growth, and adjusted EBITDA of $21.5 million, representing 48% year-over-year growth. Both of these metrics finished at the high end of our guidance. ***We're pleased with the quarter and are reiterating our 2026 full year outlook.***
>
> Before I get into the details, I want to talk about our strategy. Performance TV is about giving businesses that historically haven't had access to television, a way to reach specific consumers across premium streaming inventory and measure whether that advertising is driving revenue. MNTN created this category, and now we're seeing Performance TV move from an early adopter market toward a mainstream part of the marketing mix.
>
> ***To capture that move, MNTN began expanding our sales organization in Q4 2025, strengthening our leadership in sales and increasing our investment in marketing***. For the next stage of growth, MNTN is focused on 3 main priorities: expanding our products and continuing to invest in AI, broadening access to premium television, and strengthening our go-to-market organization. This isn't a change in strategy or new story for MNTN. It's the same opportunity we've been building towards over the past year, now with products and go-to-market structure ready to execute at greater scale.
>
> * * *
>
> To fuel the growth of new customers, we are strengthening our go-to-market organization. ***The first half of this year has been focused on construction with additional leadership adding sales, marketing, and business development***. We built vertical teams that understand the economics, objectives, creative needs, and customer acquisition dynamics of specific industries. ***That knowledge makes our sales process and the customer experience more effective***.

20. The statement in ¶19 was materially false and misleading at the time it was made because the Company was not in a position to deliver on its stated guidance for Q3 and the full 2026 year. This is because the Company had instituted changes to the compensation structure for its sales team that caused many experienced sales people to leave the Company, which materially harmed the Company's ability to generate new business. For this reason, the statement in ¶19 was also materially false and misleading to the extent it talked about expanding the sales organization when, in reality, the Company had made changes to the second quarter that were causing experienced salespeople to leave.

21. Defendant Pohlen made the following statement on the Q2 Call:

> Thank you, Mark. We reported strong second quarter results exceeding the midpoint of both our revenue and adjusted EBITDA guidance. Our solid performance reflects continued customer adoption of Performance TV, particularly by companies that had not previously advertised on television. Our second quarter revenue increased to $82.5 million, up 21% year-over-year. Second quarter gross margins improved to 80%, up 350 basis points over the prior year period.
>
> As you can see from the table in our earnings release, at the end of the second quarter, we had 4,225 active PTV customers when measured over their trailing 12 months. On a year-over-year basis, this represents growth of approximately 40%. ***As a reminder, the number of active PTV customers we add to the platform is largely within our control and is primarily driven by how aggressively we choose to invest in sales and marketing***. We continually assess and calibrate that approach to ensure that we are onboarding customers with a strong product-market fit and a high probability of succeeding on our platform.
>
> * * *
>
> While we remain focused on steadily improving profitability over time, our top priority continues to be investing behind growth rather than optimizing near-term adjusted EBITDA margins. ***To capitalize on this significant opportunity in this early-stage market, we plan on continuing to make disciplined but aggressive investments in sales and marketing to drive broader customer adoption***.
>
> * * *
>
> ***Looking ahead, we remain confident in our momentum and the underlying health of our business as we progress through 2026 and beyond. For Q3 2026, we expect revenue to be between $86 million and $89 million, representing 25% year-over-year growth at the***

> ***midpoint of $87.5 million***. We expect adjusted EBITDA to be between $22 million and $25 million, reflecting continued leverage as we scale the business while continuing to remain disciplined in our investments.
>
> ***For the full year 2026, we are reiterating our revenue guidance range of $347 million to $357 million,*** representing over 24% year-over-year growth at the midpoint of $352 million, excluding the impact of the Maximum Effort divestiture. We also continue to expect adjusted EBITDA to be between $96 million and $101 million.

22. The statement in ¶ 21 was materially false and misleading for the reasons outlined in ¶ 20.

23. The Q2 Call included the following exchange between an analyst and Defendant Douglas, in which Defendant Douglas stated in part the following:

> **Analyst**: I wanted to also ask on SMB. If we think about the go-to-market strategy for SMB and the difference of that versus kind of a mid-market customer, ***is there any change that we should expect for sales, marketing, or any other aspects of kind of the organizational strategy or cost structure that we should be thinking about with this change?***
>
> And then, Mark, just a big picture question. You mentioned sports in your prepared remarks. Can you just talk about the benefit of the World Cup? What did that bring for you guys in the quarter? And then talk about the sports opportunity more largely. Understood that's always been a draw, but how has that changed the conversation?
>
> **Defendant Douglas**: Sure. Happy to answer those. ***So in terms of go-to-market for SMB, we've been very focused since we talked about in Q4 of last year the expansion of the sales team***. And I think last quarter, we talked about continued investment in marketing. And so those -- and I talked today about kind of those themes. And so we think the opportunity here, the key thing is that we created an early adopter market. That market is now becoming mainstream.

24. Defendant Douglas' statement in ¶ 23 was materially false and misleading at the time it was made because it omitted that, during the second quarter of 2026, the Company had instituted compensation changes that caused a material number of salespeople to leave the Company. The foregoing materially harmed the Company's ability to execute on its business goals or to meet the guidance issued that same day.

25. The statements contained in ¶¶ 16-17, and 19 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants materially overstated MNTN, Inc.'s business prospects, considering that MNTN, Inc. had instituted changes that caused many experienced salespeople to leave MNTN, Inc.; (2) the foregoing materially impacted MNTN, Inc.'s ability to meet its previously issued guidance for 2026; and (3) as a result, Defendants' statements about MNTN Inc.'s business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**THE TRUTH BEGINS TO EMERGE**

26. On November 4, 2026, after market close, the Company issued a press release entitled "MNTN Reports Third Quarter 2026 Results".

27. The press release gave the following updated full year 2026 outlook, including revenue and adjusted EBITDA figures that were materially lower than the outlook presented in ¶ 17:

- ***Revenue is expected to be between $311 million and $314 million***, representing expected year-over-year growth of 10% at the midpoint excluding the impact of the Maximum Effort divestiture, and 8% year-over-year growth on a GAAP basis.
- ***Adjusted EBITDA is expected to be between $66 million and $68 million***.

28. The press release also announced third quarter revenue of $80.3 million, and Adjusted EBITDA was $19.9 million, both of which were materially lower than the Q3 guidance specified in ¶ 16.

29. Also on November 4, after market hours, the Company filed with the SEC a current report on Form 8-K. The 8-K announced Defendant Douglas' departure, who as indicated on the

Q3 Call (defined below), was terminated by the Board as a result of the misconduct outlined in this complaint. The current report further announced the departure of Chief Operating Officer Christopher Innes. Likewise, as revealed in the Q3 Call, Mr. Innes was terminated as a result of the misconduct outlined in this complaint. The current report stated the following in pertinent part:

> On November 1, 2026, the Company's Board of Directors ("Board") appointed Tony Weisman, a member of the Board, to serve as the Company's President and Chief Executive Officer, effective as of November 2, 2026 (the "Effective Date"). ***Mr. Weisman succeeds Mark Douglas as President and Chief Executive Officer, who, following 30 days of paid leave, will terminate employment with the Company on December 3, 2026***. In his executive capacity, Mr. Weisman will serve as the Company's principal executive officer, effective as of the Effective Date. ***In addition, as of the Effective Date, Christopher Innes ceased serving as the Company's Chief Operating Officer and principal operating officer and, following 30 days of paid leave, will terminate employment with the Company on December 1, 2026***.

30. On the same day, after market hours, the Company held its Q3 2026 earnings call (the "Q3 Call").

31. Preliminarily, on the Q3 call, Joseph Kaiser, lead independent director, announced that the Company had brought in Tony Weisman, MNTN's new CEO, because the "***board determined it was time to bring more operational rigor to the business***[.]" This further indicates Defendant Douglas' scienter.

32. Weisman made the following remarks regarding why the Company failed to meet its guidance issued at the beginning of the Class Period, including revealing that the company lost sellers, materially reducing its ability to generate new business:

> Thanks, Joe. Let's start with the numbers. Third quarter revenue was $80.3 million compared with the company's guidance of $86 million to $89 million. Adjusted EBITDA was $19.9 million compared with guidance of $22 million to $25 million. For the fourth quarter, we expect revenue to be between $75 million and $78 million and adjusted EBITDA to be between $8 million and $10 million. ***Our Q3 results and outlook are disappointing. We have much higher expectations at Mountain. Before accepting this role, I reviewed the business, including product market fit, customer demand, our technology, and our sales motion. I wanted to understand what had changed and***

***whether we had a practical path to address it. I concluded the issue was exclusively go-to-market execution***.

***The company recently made significant changes in the sales team that did not work out, most notably a new compensation structure modeled after the biggest platforms in our industry like Google and Meta. They were implemented too quickly, resulting in sales force attrition***. ***We lost about 40% of our experienced quota-carrying sellers, reducing our ability to bring in new business***. We've since corrected the compensation plans. We've also since hired 16 new sellers, and our first new hire class starts later this month. Additionally, we've added two proven executives, Lynn Knaak from Salesforce, leading brand sales and Frank Lee from Snap leading agency sales. They both report to me. It will take time for these sellers to fully ramp, and our updated outlook assumes that the disruption we saw in Q3 will continue into Q4.

33. Weisman also announced further personnel decisions as a result of the disappointing results, stating the following:

***Our new leaders have instilled more discipline around hiring, training and supervision, resulting in increased new starting budgets. We've changed the leadership behind the decisions that got us here***. ***Chris Innes and Garland Hill are no longer with Mountain***.

*   *   *

***Let me wrap up by saying that I know we have to earn back your confidence***. While we're hiring and onboarding salespeople now, it will take time for these sellers to fully ramp. Our outlook reflects this. When we report fourth quarter results, I'll lay out our 2027 operating plan and outlook, the measures we use to assess progress, and what our changes have delivered to that point.

34. The Q3 Call included the following exchange between an analyst and Weisman, which revealed that the changes to the sales team's compensation structure that caused the Company's financial results to suffer were put in place in the second quarter of 2026, indicating that Defendants' statements throughout the Class Period were, at best, knowingly reckless:

**Analyst**: [. . . ] [I]s there any incremental color that you can share with us just in terms of ***what specifically those changes were to the compensation structure and sort of what the thought process was going into them*** and sort of how you've corrected today?

**Weisman:** Sure. I mean when Garland joined the company from TikTok, there was a desire to move the sales organization to models that are underway at bigger platforms like TikTok, Google, Meta. Those had things to do. There was a verticalization that was deployed poorly and too quickly. There was a change in incentives from revenue to

activity, and there was a change in the frequency with which sellers were paid. ***These were told to the team in late Q2, but implemented at the beginning of Q3, and it just didn't work for most of the -- for many of the sellers who felt disaffected and they felt like their opportunity for earning had been diminished, and that's what led to the attrition***.

35. On this news, MNTN, Inc. stock plummeted $5.67 per share, or 54.67%, to close at $4.70 on November 5, 2026, on unusually high volume.

36. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

37. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired MNTN securities publicly traded on NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of MNTN, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

38. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, MNTN securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

39. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

40. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

41. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of MNTN;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused MNTN to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of MNTN securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

42. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

43. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- MNTN shares met the requirements for listing, and were listed and actively traded on NYSE, an efficient market;
- As a public issuer, MNTN filed periodic public reports;
- MNTN regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- MNTN' securities were liquid and traded with moderate to heavy volume during the Class Period; and
- MNTN was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

44. Based on the foregoing, the market for MNTN securities promptly digested current information regarding MNTN from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

45. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**COUNT I**

**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants**

46. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

48. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

49. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of MNTN securities during the Class Period.

50. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of MNTN were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of MNTN, their control over, and/or receipt and/or modification of MNTN's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning MNTN, participated in the fraudulent scheme alleged herein. To date, MNTN has not provided a competing inference by responding to any aspect of the Report.

51. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other MNTN personnel to members of the investing public, including Plaintiff and the Class.

52. As a result of the foregoing, the market price of MNTN securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of MNTN securities during the Class Period in purchasing MNTN securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

53. Had Plaintiff and the other members of the Class been aware that the market price of MNTN securities had been artificially and falsely inflated by Defendants' misleading

statements and by the material adverse information which Defendants did not disclose, they would not have purchased MNTN securities at the artificially inflated prices that they did, or at all.

54. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

55. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of MNTN securities during the Class Period.

**COUNT II**

**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

56. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

57. During the Class Period, the Individual Defendants participated in the operation and management of MNTN, and conducted and participated, directly and indirectly, in the conduct of MNTN's business affairs. Because of their senior positions, they knew the adverse non-public information about MNTN's business practices.

58. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to MNTN's financial condition and results of operations, and to correct promptly any public statements issued by MNTN which had become materially false or misleading.

59. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which MNTN disseminated in the marketplace during the Class Period

concerning MNTN's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause MNTN to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of MNTN within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of MNTN securities.

60. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by MNTN.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 20, 2026.

Respectfully submitted,

**CONDON TOBIN SLADEK SPARKS NERENBERG PLLC**

*/s/ Stuart L. Cochran*
Stuart L. Cochran
State Bar No. 24027936
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone: (214) 265-3804
Email: scochran@condontobin.com

*Liaison Counsel for Plaintiff*

**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq.
Phillip Kim, Esq.
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
philkim@rosenlegal.com

*Counsel for Plaintiff*

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against MNTN, Inc..
The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis not to exceed one-third of the recovery and will advance all costs and expenses. All payments of fees and expenses shall be made only after Court review and approval. The MNTN, Inc. Retention Agreement provided to the Plaintiff is incorporated by reference herein and is effective, upon execution and delivery by The Rosen Law Firm P.A.

**First Name:** Matthew
**Middle Initial:**
**Last Name:** LaTurner
**Mailing Address:** Redacted. [redacted]
**City:**
**State:**
**Zip Code:**
**Country:**
**Phone:**
**Email Address:**

If Representing an Entity, Title at Entity:

**Entity Name:**
**Entity Title:**

**Plaintiff certifies that:**

1. Plaintiff has reviewed a complaint and authorized its filing or the filing of an amended complaint.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

**Purchases:**

| Type of Security | Date | Shares | Unit Price |
|---|---|---|---|
| Common Stock | 08/19/2026 | 71 | $12.60 |
| Common Stock | 08/25/2026 | 278 | $13.23 |

**Sales:**

**I have not sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years, except if set forth below.**

| | |
|---|---|
| I declare and certify under penalty of perjury, under the laws of the United States of America, that the foregoing information is true and correct. | **YES** |
| By Signing below and submitting this certification form electronically, I intend to sign and execute this certification pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act and retain the Rosen Law Firm, P.A. to proceed on Plaintiff's behalf, on a contingent fee basis. | **YES** |

Date of signing: 11/19/2026 17:11:40 at Eastern Standard Time, USA

